**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **THE ESTATE OF SUZANNE BARDZELL,** | Civ. No. 20-4555 (KM) (ESK) |
| **Plaintiff,** | **OPINION** |
| **v.** | |
| **JESSICA GOMPERTS,** *in her official representative and individual capacity,* **BERGEN COUNTY PROSECUTORS OFFICE, ABC CORPORATIONS AND PUBLIC ENTITIES 1-5, and ABC CORPORATION OR ENTITIES, DIRECTORS, OFFICERS, SERVANTS, AGENTS AND/OR EMPLOYEES, JOHN/JANE DOE(S) 1-10** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff, the Estate of Suzanne Bardzell, brings this action against Defendants, the Bergen County Prosecutor's Office ("BCPO"), BCPO Assistant Prosecutor Jessica Gomperts ("AP Gomperts"), and unnamed others.[1] (Am. Compl. at 2). Defendants move to dismiss the action pursuant to Federal Rules of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction, and 12(b)(6), for failure to state a claim. For the reasons provided herein, I will grant the motion.

---

[1]     Currently operative is Plaintiff's First Amended Complaint. The initial Complaint (DE 1), filed on April 20, 2020, was amended as of right "due to a technical surplusage error that [c]ontained three lines of material on page 2 that was intended to be removed from the filing of the Complaint." (Am. Compl. at 2).

1

## I.    Summary[2]

### a.  Procedural Background

This matter arises from the murder of Suzanne Bardzell by her ex-boyfriend, former New York Police Department ("NYPD") Officer Arthur Lomando. (Am. Compl. ¶¶37-43). Lomando was convicted of the murder in the first degree and now serves what is effectively a life term in New Jersey State Prison. (Am. Compl. ¶3). Plaintiff now asserts claims against the BCPO and AP Gomperts for violations of the Federal Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983") and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. §§ 10:6-1 to -23, claiming that Defendants bear responsibility for the murder's having occurred. (Am. Compl. ¶¶156-177).

Plaintiff originally filed a civil action (No. 2:17-cv-01877 (the "17-1877 Action")) on March 21, 2017 against the Midland Park Police Department ("MPP"), the Borough of Midland Park, and Lomando. (Am. Compl. ¶¶2-3). Plaintiff settled the claims involving the Police Department and the Borough in 2018. (Am. Compl. ¶2). The 17-1877 Action remains pending with respect to Lomando. (Am. Compl. ¶3) Lomando, however, is "indigent," "destitute," and "has no funds to pay any damages." (*Id.*)

Plaintiff alleges that at the time the 17-1877 Action was filed, "the entire case as far as Plaintiff and the Plaintiff's attorneys knew about or had knowledge of, Defendant BCPO and Defendant BCPO AP Gomperts had **no** involvement whatsoever with the death of the Plaintiff." (Am. Compl. ¶4). Indeed, the complaint filed in the 17-1877 Action alleged that the Midland Park Police never consulted with the BCPO or its prosecutors. (Am. Compl. ¶5; 17-1877 Action (DE 1 ¶60)). The complaint alleges that during discovery, on April 24, 2018, Plaintiff obtained confidential police reports demonstrating "that the

---

[2]     Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

"Am. Compl." = Plaintiff's First Amended Complaint (DE 3)

Midland Park Police played only a ministerial and minor role in the matter."
(Am. Compl. ¶8). Those documents indicated that the BCPO Defendants in this
matter "had not only participated in the events that directly resulted in the
death of Suzanne Bardzell," but "took complete and absolute jurisdiction and
control of the actions local law enforcement would take." (Am. Compl. ¶9).
Hence this action.

### b. Factual Background

The facts alleged in the Amended Complaint are as follows.

Ms. Bardzell was a special education teacher and a divorced mother of
two teenage children.[3] (Am. Compl. ¶40, 43). After her divorce, Bardzell and
Lomando dated for three years before becoming estranged. (Am. Compl. 43).
Lomando, a former police officer, had "been terminated by the NYPD due to a
mental illness." (Am. Compl. ¶42). He lived in Centereach, New York. (Am.
Compl. ¶50).

Sometime prior to October 2015, Bardzell ended her relationship with
Lomando. (Am. Compl. ¶ 51). However, the complaint alleges, "Lomando
constantly stalked her in an obsessive, harassing, and disturbing fashion."
(*Id.*). On October 5, 2015, Lomando "burglarized" Bardzell's "residence by
breaking in through the garage." (Am. Compl. ¶54). Lomando then held pair of
scissors to Bardzell's throat. (*Id.*). Lomando told Bardzell that he planned to kill
her and then take his own life. *Id.* "Bardzell promis[ed] Lomando she would not
report the incident to the police, and then placat[ed] him to avoid her demise."
(*Id.*). After Lomando left her residence, Bardzell called 911 and reported the
incident to the MPP. (Am. Compl. ¶¶ 57, 58). The police reports state that
Bardzell also informed the MPP about prior, unreported acts of domestic
violence by Lomando. (*Id.*). The MPP "ran an immediate search on Lomando"
which indicated that New York Police agencies had "reported Lomando as a
missing endangered person that escaped from [a] locked unit of a [New York]

---

[3]    During her marriage, Bardzell "had been involved in a domestic incident"
with her ex-husband. (Am. Compl. ¶44).

Forensic Mental Hospital Center/Facility after he became suicidal." (Am. Compl. ¶60)

The Amended Complaint alleges that after receiving Bardzell's October 5 report, the MPP contacted BCPO and AP Gomperts "for instruction and orders as to how to proceed." (AM. Compl. ¶61). However, Defendants "took no action against Lomando to hold him for [New York] police or law enforcement authorities" as a "suicidal endangered mental hospital escapee." (Am. Compl. ¶63). Defendants did not "seek to civilly commit" Lomando; nor did they seek a court order "to maintain the involuntary commitment until Lomando was not a danger to himself or to anyone else." (Am. Compl. ¶65). Instead, Defendants "instructed, directed, and ordered [the] MPP to release Lomando from police custody." (*Id.*). After ordering Lomando's release, Defendants "took no action . . . to proactively instruct, order or direct" officers to check on Bardzell's welfare or regularly surveil her. (Am. Compl. ¶66). Defendants also failed to "order or direct that Lomando be treated as a person of interest or as a potentially dangerous person to [the] health, security and welfare of Ms. Bardzell, her children and society at large." (Am. Compl. ¶67).

The Amended Complaint alleges that AP Gomperts "instruct[ed] [the] MPP to inform Bardzell that basically there was no case, as it was her word against Lomando's word." (Am. Compl. ¶73). Thus, Defendants "ordered no investigation at all." The "MPP did not attempt to further detain or apprehend Lomando," "did no neighborhood canvassing to determine if witnesses existed," "did not secure the home as a crime scene," and did not secure "DNA evidence, fingerprint evidence and other forensic evidence." (Am. Compl. ¶¶74-75). AP Gomperts's alleged action, or inaction, allegedly caused the MPP's failure to include a second-degree burglary charge in its report form pursuant to the Prevention of Domestic Violence Act ("PDVA"): "MPP's PDVA report form acknowledged the third degree terroristic threat element of the [domestic violence] ("DV") oral Complaint made by Bardzell and the Disorderly Persons charge of harassment but the burglary crime was inexplicably not noted on the DV form." (Am. Compl. ¶76).

According to the Amended Complaint, "Defendant Gomperts' actions and orders required MPP to refuse to act to Order a Temporary Restraining Order [("TRO")] or Order of Protection to secure Ms. Bardzell more protection." (Am. Compl. ¶77). However, "Defendant Gomperts begrudgingly gave the Plaintiff the option to seek her own TRO as a private citizen" and informed Bardzell that "she could file a citizen's complaint but only as to a [third] degree case." (Am. Compl. ¶81). Thus, "no charges were issued under the PDVA" and "[t]he criminal charges only preliminarily proceeded under the third degree[,] having no real effect and nominal bail provisions." (Am. Compl. ¶84). Bardzell then obtained "her own TRO . . . from Municipal Court Judge Brady" on October 5, 2015. (Am. Compl. ¶87).

On October 6, 2016, the Teaneck Police Department ("TPD") filed criminal charges against Lomando for violating the TRO after Lomando "called Bardzell's employer" and "verbally denigrated Bardzell" to her supervisor. (Am. Compl. ¶89). That same day, "Bardzell signed citizen complaints against Lomando at the MPP, but she was not permitted to exceed filing any second degree charges regarding the [October 5] home invasion." (Am. Compl. ¶90). Plaintiff alleges that "[b]ecause Defendant Gomperts did not allow for the filing of police officer signed and issued complaints, the court process was slowed[,] allowing only for a first appearance of the case in Municipal Court that was slated for [October 27, 2015]." (Am. Compl. ¶91.)

On October 7, 2015, Bardzell requested that the MPP perform a welfare check on her children after "she could not reach them and feared Lomando [was] in or near the family's house." (Am. Compl. ¶95). The next day, "Lomando was charged with contempt and harassment." (Am. Compl. ¶96).  The MPP then filed a disorderly persons complaint in municipal court, without consulting the BCPO or AP Gomperts, alleging that "Lomando used Bardzell's personal email account to make travel reservations." (Am. Compl. ¶96).

On October 9, 2015, Bardzell reported to the TPD that "Lomando was in violation of the TRO by sending inappropriate sexually explicit photos and information via email to the assistant principal" of Bardzell's school. (Am.

Compl. ¶98). On the same date, the MPP "fully briefed Defendant BCPO AP Gomperts" as to the events that had occurred through October 9. The Amended Complaint alleges that Defendant Gomperts nevertheless ordered the MPP not to sign any criminal complaints against Lomando. (Am. Compl. ¶99).

On October 10, 2015, the TPD arrested Lomando, who then "posted a nominal bail immediately by way of bondsman and was free." (Am. Compl. ¶100). Plaintiff alleges that the BCPO Defendants were aware of the TPD domestic violence reports and TPD charges against Lomando for violating the TRO. (Am. Compl. ¶101). Also on October 10, Bardzell contacted the MPP to report "that Lomando was stalking her" and that "his vehicle was parked two blocks away from her home, in violation of the TRO." (Am. Compl. ¶102). Without consulting the BCPO or Gomperts, MPP officers "through the Bergen County Police sent out an alert to all SWAT and Rapid Deployment Force Bravo Company in Bergen County and within local police agencies to apprehend Lomando," which the Defendants automatically received. (Am. Compl. ¶¶103, 105). Lomando, who Plaintiff alleges was "obviously" either "armed with a police scanner" or "inside information," "turned himself in to the police just before the first responders could arrest him themselves." (Am. Compl. ¶107). The Amended Complaint alleges that "Defendant BCPO officials and/or Defendant Gomperts are believed to have ordered all police officials and the rapid deployment force to stand down," and ordered the officials "to immediately release Lomando back into society."[4] (Am. Compl. ¶108).

Despite having knowledge of Lomando's activities from October 5 through October 10, Defendants BCPO and AC Gomperts "took no action to order the MPP to have in place a police presence at or near the Bardzell home," "took no steps to engage the New York authorities on Bardzell's behalf to forcibly remove Lomando from his Centereach home," and "took no affirmative steps to protect" Bardzell. (Am. Compl. ¶¶110-113).

---

[4]     The Amended Complaint alleges that between October 6 and October 10, "[t]here were at least two manhunts" for Lomando." (Am. Compl. ¶109).

On October 11, 2015, Bardzell reported to the MPP "that Lomando may have called her home in violation of the TRO." (Am. Compl. ¶114). The next day, Bardzell requested that the MPP "check on a vehicle in [her] driveway that reasonabl[y] probably belonged to Lomando." (Am. Compl. ¶115). She also reported that her burglar alarm had been activated. (*Id*.). Despite being aware of that report, Defendants "took no further action." (*Id*.)

On October 14, 2015, Bardzell informed the MPP that she was receiving "harassing hang-up telephone calls" that "were presumed to have been made by Lomando, in violation of the TRO." (Am. Compl. ¶117). Bardzell reported those phone calls again the following day. (Am. Compl. ¶118).

In light of the aforementioned, Plaintiff alleges that Defendants took the following "affirmative acts . . . to overly protect Lomando" from application of the PDVA:  (1) ordering the MPP to refuse filing a second-degree burglary criminal complaint; (2) stopping the MPP and New York law enforcement officials "from affirmatively effectuating Lomando's arrest in New York or New Jersey"; (3) "acting to show Lomando favoritism due to his ex-police officer status"; and (4) allowing Lomando to believe "that the BCPO would not prosecute him or pursue him if he committed DV acts against Bardzell whenever and wherever he wanted." (Am. Compl. ¶122). The Amended Complaint alleges that "[b]ut for these unlawful acts," "Bardzell would be alive today." (Am. Compl. ¶126). It alleges further that Defendants violated the New Jersey Attorney General Guidelines on domestic violence, and that "the extent of shock the conscience actions by these Defendants is so gross and extreme that it is not only in violation of the Plaintiff's federal and state civil rights laws" but "is tantamount to criminal felony manslaughter showing reckless indifference to human life." (Am. Compl. ¶152).

In short, the Amended complaint alleges, from October 5 until October 22, 2015, the MPP gave Defendants "correct, accurate, up to date, in depth and timely notifications . . . regarding domestic violence acts being committed by Lomando." The prosecutors, however, failed to take any effective action in response to those reports. (Am. Compl. ¶47).

On October 22, 2015, Lomando murdered Bardzell in her vehicle while parked at her residence. (Am. Compl. ¶¶37-41). Lomando repeatedly stabbed Bardzell with a machete knife. (Am. Compl. ¶¶37-38).

The Amended Complaint asserts two claims against Defendants. Count One seeks relief under Section 1983 and Count Two seeks relief under the NJCRA. (Am. Compl. ¶¶156-177). Both claims seek vindication of Plaintiff's substantive due process right "to be free from state-created danger." (Am. Compl. ¶¶160, 171).

Defendants move to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction, and 12(b)(6), for failure to state a claim. That motion is now before the Court.

## II.   Discussion

### a.  Legal standards

What is alleged here is a "state-created danger" claim. While "the Due Process Clause imposes no affirmative duty to protect a citizen who is not in state custody," a "constitutional violation can occur when state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the absence of state intervention.'" *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006) (quoting *Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (3d Cir.2003)). The essentials of a state-created danger claim are as follows:

(1) "the harm ultimately caused was foreseeable and fairly direct;"

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts," or a "member of a discrete class of persons subjected to the potential harm brought about by the state's actions," as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir.1996); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906, 913 (3d Cir.1997)). Liability under the fourth element "is predicated upon the states' *affirmative acts* which work to the plaintiffs' detriments in terms of exposure to danger." *Id.* at 282 (internal quotation marks omitted) (quoting *D.R. by L.R. v. Middle Bucks Area Vo. Tech. Sch.*, 972 F.2d 1364, 1374 (3d Cir.1992) (*en banc* )). Indeed, "[i]t is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Id.*

The defendants challenge the sufficiency of the Amended Complaint on various grounds, but initially on grounds of Eleventh Amendment sovereign immunity and absolute prosecutorial immunity.

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013).

That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party,

bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Claims of Eleventh Amendment sovereign immunity—perhaps more for convenience than anything else—are frequently analyzed under Fed. R. Civ. P. 12(b)(1). A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) may be brought as a facial or factual challenge. *See Church of the Universal Bhd. v. Farmington Twp. Supervisors*, 296 F. App'x 285, 288 (3d Cir. 2008). Where, as here, the motion challenges jurisdiction on the face of the complaint, the court only considers the allegations of the complaint and documents referred to therein in the light most favorable to the plaintiff. *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). As a result, the analysis is fairly similar to that under an ordinary Rule 12(b)(6) motion.[5]

### b. Sovereign immunity: Official-capacity claims against BCPO and AP Gomperts

Defendants assert that the Eleventh Amendment immunity bars all federal-court claims brought against BCPO and against AP Gomperts in her official capacity.[6] (DE 7-1 at 9, 14).

---

[5]     I do not propose to explore here the quasi-jurisdictional status of the Eleventh Amendment. It is, of course, expressed as a limitation on the "judicial power" of the United States. Still, it is also a defense waivable by the State, a feature ordinarily considered incompatible with the idea of subject matter jurisdiction. So long as it is kept in mind that it is the State's burden to invoke and establish such immunity, and particularly in the context of a facial challenge, it makes little difference whether the procedural vehicle is seen as Rule 12(b)(1) or Rule 12(b)(6).

[6]     In her official capacity, AP Gomperts stands in the shoes of her employer, the BCPO. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Allen v. New Jersey State Police*, 974 F.3d 497, 506 (3d Cir. 2020) (quoting *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The United States Supreme Court has interpreted that language to mean that states may not be sued by private parties in federal court without consent:

> That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that *the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given*: not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification.

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–99, 104 S. Ct. 900, 907 (1984) (internal quotation marks omitted) (quoting *Ex parte State of New York No. 1*, 256 U.S. 490, 497 (1921)). Thus, despite its limited wording, the Eleventh Amendment embodies a more general principle of sovereign immunity.

The Eleventh Amendment may bar an action even where a state is not a named party; it extends to state agencies and state officers, "as long as the state is the real party in interest." *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989); *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 857 (3d Cir. 2014). The Third Circuit has formulated a "specific and comprehensive test to determine whether eleventh amendment immunity extends to an entity." *Fitchik*, 873 F.2d at 659. To

---

S.Ct. 2304, 105 L.Ed.2d 45 (1989) (internal citation omitted)). The claims against AP Gomperts in her personal capacity are discussed separately below.

determine in a contested case whether the immunity applies, a court analyzes three questions:

> (1) Whether the money that would pay the judgment would come from the state (. . . whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);
>
> (2) The status of the agency under state law (. . . how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and
>
> (3) What degree of autonomy the agency has.

*Id.*

Eleventh Amendment immunity does not generally extend downward from the state to its constituent "counties and municipalities." *Estate of Lagano*, 769 F.3d at 857. The immunity may, however, apply to county prosecutors to the extent they are exercising state power. *Id.* (holding that a court must apply the *Fitchik* factors in determining whether the immunity applies to county prosecutors in a particular case).

It must be said at the outset that precedent largely answers this recurring question. Courts in this district have routinely held that county prosecutors, when pursuing their core functions, are entitled to Eleventh Amendment immunity. *See, e.g., Ong v. Superior Court of Hudson Cty.*, No. 1606777, 2018 WL 324722, at *5 (D.N.J. Jan. 8, 2018), *aff'd*, 760 F. App'x 133 (3d Cir. 2018) ("County Prosecutor's Offices in New Jersey, including the Hudson County Prosecutor's Office, when performing their law enforcement functions, have regularly been held to be acting as arms of the State for Eleventh Amendment purposes."); *Rouse v. New Jersey Dep't of Health & Human Servs.*, No. 15-01511, 2015 WL 5996324, at *3 (D.N.J. Oct. 13, 2015) ("Applying the Third Circuit's *Fitchik* factors, this Court also finds that the HCPO is an 'arm of the state' entitled to sovereign immunity.") The issue, then,

is largely settled by persuasive or binding precedent. I nevertheless will perform my own analysis of the *Fitchik* factors, as indicated by *Estate of Lagano*.[7]

Defendants assert that any time a county prosecutor's office engages in law enforcement activities, it is entitled to Eleventh Amendment immunity. (*See* DE 7-1 at 14-18; DE 11 at 6-9). That is an exaggeration. Of course, the nature of the prosecutorial activities is of great importance in the *Fitchik* analysis, but in *Lagano*, the Third Circuit declined to apply a bright-line rule that county prosecutors are *always* entitled to immunity when acting in a law enforcement capacity. 769 F.3d at 857*; see also Murphy v. Middlesex Cty.*, No. CV 15-7102, 2017 WL 6342154, at *4 (D.N.J. Dec. 12, 2017) ("*Estate of Lagano . . .* reiterated that *Fitchik* controls Eleventh Amendment analysis, and held that District Courts may not find that the *Fitchik* factors are satisfied any time a county prosecutor engages in classic prosecutorial or investigative function.").[8]

---

[7]     The defendants, as the parties invoking the Eleventh Amendment immunity, have the burden to establish it. *See, e.g., Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140 (3d Cir. 1995). Employing a motion to dismiss standard to the face of the complaint, in the context of the cited legal precedent, I find that they have done so, without the necessity of an evidentiary hearing.

[8]     In this limited respect, at least, there is a distinction between the Eleventh Amendment analysis and the statutory-construction issue of whether a defendant is a "person" for purposes of 42 U.S.C. § 1983. Thus, in analyzing the Eleventh Amendment issue, the Court of Appeals has distinguished its decision in *Coleman v. Kaye*, 87 F.3d 1491 (3d Cir. 1996):

> Rather than applying *Fitchik* to the facts alleged by the Estate to reach the conclusion that the [county prosecutor's office] was entitled to Eleventh Amendment sovereign immunity, the District Court relied solely on our decision in *Coleman*. The District Court's reading of *Coleman* is erroneous. First, *Coleman* never mentions *Fitchik*. And second, *Coleman* does not address Eleventh Amendment sovereign immunity. Instead, Coleman focuses on the question of what entities and public officials may be regarded as arms and officials of the State for the purpose of determining whether the named entity and public official are to be regarded as "persons" subject to suit under § 1983.

*Estate of Lagano*, 769 F.3d at 857.

The argument that BCPO and AP Gomperts are not "persons" for purposes of 42 U.S.C. § 1983 or the NJCRA is not one of Eleventh Amendment immunity or jurisdiction, but of statutory construction. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64–65, 109 S. Ct. 2304, 2308–09 (1989). The defendant's status as a

*Fitchik* factor one asks whether the State would find itself responsible for damages if the plaintiff prevailed in this case. The New Jersey Supreme Court has ruled definitively that when county prosecutors act in their law enforcement or investigatory capacity, "they act as 'agents' and 'officers' of the State, qualifying as State employees under N.J.S.A. 59:1–3 for the purpose of determining vicarious liability under the TCA." *Wright v. State*, 778 A.2d 443, 462 (N.J. 2001) (alteration in original) (internal citations omitted). I therefore take that inquiry—whether Defendants were engaged in law enforcement or investigatory functions—as an important guide to the first step of the *Fitchik* analysis.

The claims here arise primarily from the failure of BCPO and AP Gomperts to prosecute Lomando and their failure to authorize the filing of more serious criminal charges, such as a second-degree burglary charge, against him. (*See* Am. Compl. ¶¶73-155). "Decisions such as whether to bring charges are clearly within the 'law enforcement function[s] . . . that the Legislature has delegated to the county prosecutors.'" *Rouse*, 2015 WL 5996324 at *3 (quoting *Wright*, 778 A.2d at 462). Thus, the decision whether to prosecute Lomando, and the decision to cap the degree of charges, squarely fall within the BCPO's law enforcement function.[9] *See id.* Therefore, the first *Fitchik* factor is satisfied.

The second factor concerns the status of the BCPO under state law. *See Fitchik*, 873 F.2d at 659. "The office of county prosecutor in the State of New Jersey is a constitutionally established office." *Wright*, 778 A.2d at 452 (internal quotation marks omitted) (quoting *Coleman*, 87 F.3d at 1500); N.J. Const. art. VII, § 2, ¶ 1 ("County prosecutors shall be nominated and appointed by the Governor with the advice and consent of the Senate. Their term of office

---

"person" is related to the Eleventh Amendment inquiry, but it is not the same. *See Lagano*, 769 F.3d at 857 ("Although the existence of Eleventh Amendment sovereign immunity was a factor considered by the Supreme Court in *Will*, the two concepts are analytically distinct."). The *Will* analysis would require the same result here, but the Eleventh Amendment issue is logically prior, so I decide the case on those grounds.

[9]    I here confine myself to the gist of the claims. I parse them in more detail below. *See* Section II.c, *infra*.

shall be five years, and they shall serve until the appointment and qualification of their respective successors."). The BCPO's "status as a 'constitutionally established office' satisfies the second *Fitchik* factor." *Rouse*, 2015 WL 5996324 at *3.

The third *Fitchik* factor considers the degree of BCPO's autonomy from the State. *See Fitchik*, 873 F.2d at 659. That factor is satisfied where, as here, "a county prosecutor acting with prosecutorial authority is not an autonomous entity separate from the State." *Rouse*, 2015 WL 5996324 at *3. Indeed, in *Wright*, the New Jersey Supreme Court noted the prosecutor's relative independence in local administrative matters, but explained that, in contrast, "a prosecutor whose actions do involve the enforcement of the criminal laws does not enjoy a comparable degree of autonomy from the State government." 778 A.2d at 464. In the end, "the [State] Attorney General has the ultimate responsibility in matters related to the enforcement of the State's criminal laws that have been legislatively delegated to county prosecutors." *Id.* (citing N.J.S.A. 52:17B–98; N.J.S.A. 52:17B–103).

Based on the *Fitchik* factors, I find no reason, based on the circumstances of this case, to depart from the case law cited above. I hold that the BCPO and AP Gomperts in her official capacity are entitled to sovereign immunity under the Eleventh Amendment.

I therefore dismiss the complaint, insofar as it is asserted against BCPO and AP Gomperts in her official capacity, because the Eleventh Amendment bars assertion of such claims in this federal court. I dismiss the claims without prejudice to reassertion in any forum that is empowered to hear them. And as to these claims, I do not reach the Defendants' additional substantive arguments.

15

### c. Prosecutorial Immunity: Individual-capacity claims against AP Gomperts

I turn to the claims under Section 1983 and the NJCRA insofar as they are asserted against AP Gomperts in her personal capacity. (DE 7-1 at 22-26, 32). As to such personal claims, a defendant may assert personal defenses, such as immunity.

The Supreme Court first recognized a prosecutor's absolute immunity from Section 1983 suits in *Imbler v. Pachtman*, 424 U.S. 409, 420 (1976). "More than a mere defense to liability, prosecutorial immunity embodies the 'right not to stand trial.'" *Odd v. Malone*, 538 F.3d 202, 207 (3d Cir. 2008) (quoting *In re Montgomery County*, 215 F.3d 367, 373 (3d Cir. 2000)). Therefore, the immunity "is properly raised in a Rule 12(b)(6) motion to dismiss." *Id.*

Prosecutors bear a "heavy burden" in establishing entitlement to absolute immunity; it is presumed "that qualified rather than absolute immunity is appropriate." *Id.* at 207-08. To establish absolute immunity, a prosecutor must show that "she was functioning as the state's advocate when performing the action(s) in question." *Id.* at 208. The Third Circuit takes a functional approach: "a prosecutor enjoys absolute immunity for actions performed in a judicial or "quasi-judicial" capacity." *Id.* (quoting *Giuffre v. Bissell*, 31 F.3d 1214, 1251 (3d Cir. 1994)). The immunity applies to a prosecutor's actions are "'intimately associated with the judicial phases of litigation,'" but does not apply "to administrative or investigatory actions unrelated to initiating and conducting judicial proceedings." *Id.* (quoting *Giuffre*, 31 F.3d at 1251).

Accordingly, as to absolute immunity, the Third Circuit eschews bright-line rules in favor of a fact-sensitive inquiry. *Id.* at 210. Relevant considerations include the timing of the prosecutor's actions (pre- or post-indictment), and the setting of the prosecutor's acts (in or out of court). *Id.* These are not, however, bright-line rules.

### i. Gomperts's declination of the case

I first consider Plaintiff's challenges to Gomperts's decision not to prosecute Lomando. (*See* Am. Compl. ¶¶73-155) Closely associated with that decision are her instruction to the MPP to inform Bardzell that "there was no case" regarding the alleged burglary because "it was her word against Lomando's word" (Am. Compl. ¶73); her efforts in "shut[tting] the entire case down" which led to a failure to collect further evidence (Am. Compl. ¶75); and her instruction to the MPP to release Lomando from police custody (Am. Compl. ¶¶65, 71, 108).

These actions, I find, fall within the category of a prosecutor's decision whether to initiate a prosecution and her alleged failure to conduct an adequate investigation of criminal charges, both of which are protected by absolute immunity. *See Kulwicki v. Dawson*, 969 F.2d 1454, 1463–64 (3d Cir. 1992) ("The decision to initiate a prosecution is at the core of a prosecutor's judicial role. A prosecutor is absolutely immune when making this decision, even where he acts without a good faith belief that any wrongdoing has occurred.") (internal citations omitted); *Fuchs v. Mercer Cty.*, 260 F. App'x 472, 475 (3d Cir. 2008) ("Prosecutors enjoy absolute immunity for the decision to initiate a prosecution, for evaluation of evidence collected by investigators, and even for failure to conduct adequate investigation before filing charges.") (internal citations omitted). If a prosecutor has absolute immunity from a claim that she initiated a case without believing she had evidence of wrongdoing, then it follows that she must have absolute immunity in declining to initiate what she believes is a weak case. *See Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir. 1989) ("We think that, as a matter of logic, absolute immunity must also protect the prosecutor from damages suits based on his decision *not* to prosecute."). And the same goes for investigation, or non-investigation, that is related to bringing or not bringing criminal charges. *Woolfolk v. Thomas*, 725 F. Supp. 1281, 1283 (N.D.N.Y. 1989) ("In this court's opinion the decision not to investigate is 'sufficiently closely related' to the decision not to prosecute so as

to qualify defendant [prosecutor's] decision for absolute immunity."). Perhaps most declinations, after all, carry with them an express or implied decision not to investigate further. AP Gomperts's decision to withhold charges and forgo further investigation fall within this category.

The instruction to MPP to release Lomando, too, is part and parcel of that prosecutorial decision. Lomando was under arrest, but the prosecutor had declined the case, so of course he had to be released. An administrative act— say, botching or withholding the necessary paperwork—might fall outside the core prosecutorial function. *See Odd*, 538 at 217 (prosecutor's failure to perform the "fundamentally administrative task" of "notifying the warrant-issuing judges that [detainees] remained incarcerated after it was clear that their testimony would not be needed for quite some time."). This order of release, however, inevitably follows from, and was an ordinary incident of, the decision not to prosecute.

Plaintiff argues that Gomperts's "instruction" to the MPP that there was "no case" was mere legal advice, and hence fell outside the scope of immunity for decisions whether to prosecute. Here, Plaintiff cites the Supreme Court's holding in *Burns v. Reed* that absolute immunity does not apply "to the prosecutorial function of giving legal advice to the police." 500 U.S. 478, 486, 111 S. Ct. 1934 (1991).

I find *Burns* distinguishable. There, a state prosecutor advised the Indiana police that it was permissible to question a suspect under hypnosis. 500 U.S. at 478. The Supreme Court held that such advice was not protected by absolute immunity. *Id.* at 496. The *Burns* prosecutor was not accepting or rejecting prosecution of a case, but rendering real-time advice to the police as to the legality of an investigative technique.

Here, however, Gomperts did not give the MPP legal advice as to how to perform their jobs. Instead, she told them that there was no case against Lomando, because the evidence was equivocal. Substitution of the word "instructed" for "told" does not change the substance of the communication.

(*See* Am. Compl. ¶ ("Defendant Gomperts provided information to MPP instructing MPP to inform Bardzell that basically there was no case, as it was her word against Lomando's word."). The police brought AP Gomperts a case for prosecution. Whether rightly or wrongly, AP Gomperts replied that the evidence presented a "he said/she said" scenario, and declined to prosecute it. For purposes of absolute immunity, I see no sustainable distinction between a prosecutor's declining a case and a prosecutor's *stating* to the police and complaining witness that she is declining a case; they amount to the same thing.

### ii. Gomperts's limitation of Bardzell's criminal complaint

I move on to a second set of claims, consisting of Plaintiff's challenges to Gomperts's refusal to allow Bardzell to sign a criminal complaint for second degree burglary (Am. Compl. ¶76), and the limitation of Bardzell's citizen complaint to a third degree charge. (Am. Compl. ¶81) The Amended Complaint alleges that "Gomperts' actions and orders caused MPP to refuse . . . to sign criminal Complaints under the PDVA for a second degree burglary charge." (Am. Compl. ¶76).

The PDVA provides for mandatory arrest and signing of a criminal complaint in certain situations:

> When a person claims to be a victim of domestic violence, and where a law enforcement officer responding to the incident finds probable cause to believe that domestic violence has occurred, the law enforcement officer shall arrest the person who is alleged to be the person who subjected the victim to domestic violence and shall sign a criminal complaint if:
>
> (1) The victim exhibits signs of injury caused by an act of domestic violence;
>
> (2) A warrant is in effect;
>
> (3) There is probable cause to believe that the person has violated N.J.S. 2C:29-9, and there is probable cause to believe that the person has been served with the order alleged to have been violated. If the victim does not have a copy of a purported order,

> the officer may verify the existence of an order with the appropriate law enforcement agency; or
>
> (4) There is probable cause to believe that a weapon as defined in N.J.S.2C:39-1 has been involved in the commission of an act of domestic violence.

N.J. Stat. Ann. § 2C:25-21(a). The PDVA also preserves some catchall authority for arrests and criminal complaints in domestic violence cases that do not meet the 21(a) criteria:

> A law enforcement officer may arrest a person; or may sign a criminal complaint against that person, or may do both, where there is probable cause to believe that an act of domestic violence has been committed, but where none of the conditions in subsection a. of this section applies.

N.J. Stat. Ann. § 2C:25-21(b).

Plaintiff argues that Gomperts is not entitled to absolute immunity because (1) the PDVA mandated arrest and a criminal complaint for the alleged burglary and that therefore, (2) Gomperts's duties were "administrative and procedural" instead of "advocative or discretionary." With respect to whether arrest was mandatory under N.J. Stat. Ann. § 2C:25-21(a), the Amended Complaint does not allege that (1) Bardzell displayed signs of injury; (2) a warrant was in effect; or (3) Lomando violated, hindered, obstructed, or impeded a judicial or protective order under N.J.S.A. 2C:29-9 during the alleged burglary. The factual allegations of the Amended Complaint could support an inference, however, that (4) the MPP had probable cause to believe a weapon, as defined by N.J.S.A. 2C:39-1, had been involved in the commission of an act of domestic violence: Bardzell allegedly reported to the MPP that Lomando burglarized her home and threatened her with a pair of scissors. (Am. Compl. ¶51). Additionally, upon running an immediate search on Lomando, the MPP became aware that he was "a missing endangered person that escaped from [a] locked unit of a NY Forensic Mental Hospital/Facility after he became suicidal." (Am. Compl. ¶60).

I will assume, based on those allegations, that the police had probable cause to believe Lomando used a weapon in the commission of an act of domestic violence.[10] Nevertheless, that circumstance did not render Gomperts's function so nondiscretionary that she acted as an administrator rather than a prosecutor. Indeed, assessment of the strength of a probable cause showing is an essential prosecutorial function.

Fundamentally, these sections of the PDVA seem to be directed to the police, not the prosecutor. But even as to the police themselves, the PDVA does not impose duties that are merely administrative or ministerial. In *S.P. v. Newark Police Department*, for example, the Superior Court of New Jersey, Appellate Division considered whether officers were entitled to immunity under the New Jersey Tort Claims Act ("NJTCA") for the failure to arrest an alleged attacker where the officers determined that the complainant was not a victim of domestic violence and exhibited no visible injuries. 52 A.3d 178, 179 (N.J. Super. Ct. App. Div. 2012). There, the plaintiff, S.P., filed a suit against the City of Newark alleging that "it was negligent, careless, and reckless when its police officers failed to arrest and remove Louis Alfredo Santiago, Jr. pursuant to the PDVA, N.J.S.A. 2C:25–21, after S.P. reported to police that Santiago had groped and propositioned her sexually." *Id.* at 179-80. S.P. and Santiago were boarders in a rooming house. *Id.* at 179. The City argued that the PDVA did not apply because S.P. and Santiago were not "household members," and, therefore, S.P. was not protected by the Act. *Id.* at 180. The Appellate Division concluded that the "boarders were members of the same household within the intendment of the PDVA," but held, however, that the immunity provisions of

---

[10]     Under the PDVA, the usual definition of probable cause applies: "Probable cause exists if at the time of the arrest 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense.'" *Wildoner v. Borough of Ramsey*, 744 A.2d 1146, 1154 (2000).

the NJTCA applied "because the officers did not have a ministerial duty to arrest pursuant to the PDVA under the[] circumstances."[11] *Id.* at 179.

The Appellate Division reasoned that, under the circumstances presented, the officers were required to exercise judgment in determining whether the PDVA's mandatory arrest provisions applied. *Id.* at 190-91. The court explained:

> We are convinced, however, that the ensuing decisions of a responding officer to a call such as that from S.P., as detailed, in part, in N.J.S.A. 2C:25–21 and –23, requires a significant thoughtful analysis and exercise of personal deliberations regarding a variety of factors such that discretionary immunity should attach under the TCA. As previously discussed, the officer must determine whether the initial qualifier is met under the PDVA, i.e., that the person is a "victim of domestic violence" and there is probable cause to believe that "domestic violence" has occurred. See N.J.S.A. 2C:25–21. As is evident in this case, the decision does not always involve the enumerated categories of "household member" and is not always black and white.

> The officer is then mandated to arrest the alleged perpetrator and sign a criminal complaint if he or she determines one of the enumerated factors is present, which involves another judgment call of whether or not the victim "exhibits signs of injury caused by an act of domestic violence." N.J.S.A. 2C:25–21(a)(1). The officer is guided under the statute to construe "exhibits" liberally to mean any indication of bodily injury, including "physical pain or impairment of physical condition" and where the victim complains of injury but exhibits no visible sign, the officer *should* consider other relevant factors in determining whether there is probable cause to make an arrest. N.J.S.A. 2C:25–21(c) (emphasis added).

> Moreover, even in the absence of this condition, an officer *may* arrest or sign a criminal complaint, or both, against the alleged

---

[11] The NJTCA immunizes public entities and employees for injury that results from "the exercise of judgment or discretion." N.J. Stat. Ann. § 59:3-2(a); *S.P.* 52 A.3d at 190. However, immunity may not apply to "ministerial" acts in "which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done." *S.P.* 52 A.3d at 190 (internal quotation marks omitted) (quoting *Morey v. Palmer*, 556 A.2d 811 (N.J. Super. Ct. App.Div.1989))

> perpetrator if there is probable cause to believe an act of domestic
> violence has been committed. N.J.S.A. 2C:25–21(b) (emphasis
> added). This involves another discretionary decision. See *No Illegal
> Points, Citizens for Drivers Rights, Inc. v. Florio*, 264 N.J.Super. 318,
> 329, 624 A.2d 981 (App.Div.) (stating that "the word 'shall' is
> generally construed to be mandatory and the word 'may'
> permissive or directory"), *certif. denied*, 134 N.J. 479, 634 A.2d 526
> (1993).

*Id.* Because the arrest provision, although "mandatory," nevertheless requires
law enforcement officers to exercise some judgment, the Appellate Division was
not convinced that the New Jersey Legislature "intended to make officers such
as [the Newark Police Department defendants] civilly liable for the victim's
subsequent injury if, within their judgment, [the victim] was not entitled to the
protections of the PDVA." *Id.* at 190.[12]

 *A fortiori,* the reasoning of *S.P.* applies to the role of the prosecutor.
Nothing about the case, or the PDVA itself, suggests that this mandate removes
the discretion of the prosecutor. Nor is application of the mandatory arrest
provision as black-and-white as Plaintiff suggests; judgment calls must be
made at the police level, and even more so at the prosecutorial level. Here, the
MPP was tasked with determining whether there was probable cause to believe
an act of domestic violence occurred, and the BCPO with reviewing that
determination. That task – particularly when there is no sign of injury – is not
akin to the merely administrative functions in the cases cited by Plaintiff. In
*Odd*, for example, the prosecutor had the "fundamentally administrative task"
of "notifying the warrant-issuing judges that [detainees] remained incarcerated
after it was clear that their testimony would not be needed for quite some
time.". 538 F.3d at 217. Similarly, in *Schneyder v. Smith,* the prosecutor failed
to fulfill the administrative duty of informing a warrant-issuing judge of a four-

---

[12]     Suggestively, the Appellate Division noted in dictum that "judges may
ultimately differ as to whether the victim was entitled to PDVA protection," but, under
the NJTCA, had a judge in that case refused a TRO on the basis that the PDVA did not
apply, "there would have been express absolute immunity for the judge and State." *Id.*

month continuance that resulted in a witness's continued incarceration. 653 F.3d 313, 332-33 (3d Cir. 2011). Essentially this was a matter of paperwork— getting a status update from here to there. While the required conduct in *Schneyder* and *Odd* "lack[ed] any significant discretionary or advocative component," determining whether the PDVA's probable cause requirement applied here did require the exercise of prosecutorial discretion. *See Id.* at 653 F.3d at 333. Thus, Gomperts's refusal to initiate a criminal complaint for second-degree burglary under the PDVA is protected by absolute immunity.

I also find that Gomperts is entitled to prosecutorial immunity for her limitation of Bardzell's citizen complaint to a third degree charge. (*See* Am. Compl. ¶81). New Jersey Rule of Court 3:2-1 authorizes a citizen complaint charging any indictable offense. N.J. Ct. R. 3:2-1(a). That being said, disgruntled citizens' ability to charge each other criminally is expressly subjected to discretionary prosecutorial review. The Rule requires that a county prosecutor review and, if appropriate, quash or modify the complaint:

> Prior to a finding of probable cause and issuance of a Complaint-Warrant (CDR-2) or a Complaint-Summons (CDR-1) charging any indictable offense made by a private citizen against any individual, the Complaint-Warrant or Complaint-Summons shall be reviewed by a county prosecutor for approval or denial. *Prior to approval, the prosecutor has the authority to modify the charge*. If the prosecutor approves the citizen complaint charging an indictable offense, the prosecutor shall indicate this decision on the complaint and submit it to a judge who will determine if probable cause exists and whether to issue a Complaint-Warrant or a Complaint-Summons in accordance with R. 3:3-1 in the Judiciary's computerized system used to generate complaints. If the prosecutor denies the citizen complaint charging an indictable offense, the prosecutor shall report the denial and the basis therefor to the Assignment Judge on the record or in writing and shall notify the citizen complainant and the defendant.

N.J. Ct. R. 3:2-1(a)(3) (emphasis added); *see also In re Grand Jury Appearance Request by Loigman*, 870 A.2d 249, 256 (2005) ("When a complaint alleging an indictable offense is filed in municipal or superior court, our rules require that

the complaint and all related investigative reports be forwarded to the prosecutor for [her] review. The prosecutor then determines whether the charges merit presentation to the grand jury or, alternatively, outright dismissal or downgrade to the municipal court. In the case of a dismissal, the prosecutor must give the basis for [her] decision to the Assignment Judge.") (internal citations omitted).

What the Rule calls for is an exercise of precisely the kind of judgment that is protected by prosecutorial immunity. Under the clear language of the Rule, Gomberts had the duty to review and the authority to modify the charge in Bardzell's citizen complaint. *See* N.J. Ct. R. 3:2-1(a)(3). The decision of what charges may be brought against a defendant in a citizen complaint is "intimately associated with the judicial phases of litigation." *See Odd,* 538 F.3d at 208. Indeed, a prosecutor's approval is required before a citizen complaint can be submitted to a judge, who will then determine whether probable cause exists and whether to issue a Complaint-Warrant or Complaint-Summons. N.J. Ct. R. 3:2-1(a)(3).

I therefore hold that Gomperts's limitation of Bardzell's citizen complaint to a third-degree charge is protected by absolute immunity.

### iii. Gomperts's failure to restrain Lomando by other means

Finally, I consider a third set of claims, based on Gomperts's failure to seek a TRO or Order of Protection (Am. Compl. ¶77), or to take other affirmative steps to protect Bardzell (Am. Compl. ¶113). Here, my analysis is impaired somewhat by Plaintiff's failure to specifically address Gomperts's immunity with respect to those claims. (*See* DE 10 at 22-27). Plaintiff does, however, state generally that "Defendants' acts and omissions occurred during the investigation of Lomando's ongoing domestic violence spree, 'during [a] period of judicial inactivity,' a fact that 'casts serious doubts on [Gomperts'] claims that her actions [were intimately associated with the judicial phase of the litigation.'" (DE 110 at 24 (alterations in original) (quoting *Schneyder,* 653 F.3d at 332)).

These allegations (a) are insufficient to pierce the shield of prosecutorial immunity, and even if they did, (b) they would be insufficient to state a claim.

The omitted act—obtaining a TRO—is closely tied to the prosecutor's determination whether to prosecute, for immunity purposes. As noted, the timing is relevant, but the Third Circuit has rejected a bright-line rule that absolute immunity does not apply to actions taken prior to the initiation of criminal charges. *Odd*, 538 F.3d at 210 ("We have rejected bright-line rules that would treat the timing of the prosecutor's action (e.g. pre- or postindictment), or its location (i.e. in- or out-of-court), as dispositive."). Indeed, "some pre-indictment acts—like obtaining, reviewing, and evaluating evidence in preparation for prosecution . . . may be advocative and entitle a prosecutor to absolute immunity." *Id.* at 211 n.3. Thus, Gomperts's failure to issue a TRO or other protections to Bardzell may be protected even if such omission occurred during the "investigation" of Lomando's actions. *See id.*

Also lacking is an allegation that the prosecutor failed to discharge any duty she had under the PDVA. True, the PDVA provides for the issuance of emergency relief and TROs:

> A plaintiff may seek emergency, ex parte relief in the nature of a temporary restraining order. A municipal court *judge* or a *judge* of the Family Part of the Chancery Division of the Superior Court may enter an ex parte order when necessary to protect the life, health or well-being of a victim on whose behalf the relief is sought.

N.J.S.A. 2C:25-28(f) (emphasis added). Further, "[i]f it appears that the plaintiff is in danger of domestic violence, the *judge* shall, upon consideration of the plaintiff's domestic violence complaint, order emergency ex parte relief, in the nature of a temporary restraining order. A decision shall be made by the judge regarding the emergency relief forthwith." N.J.S.A. 2c:25-28(g) (emphasis added). The statutory text authorizes a *plaintiff* to seek, and a *judge* to issue, a TRO; it says nothing about prosecutors at all. At any rate, Bardzell *did* obtain a TRO through a municipal court judge. (Am. Compl. ¶87).

As noted, there are other flaws in the underlying theory of liability. Even if Gomperts had the ability or duty to obtain a TRO or other protection under the circumstances presented, "a state's failure to take affirmative action to protect a victim from the actions of a third person will not, in the absence of a custodial relationship between the state and the victim, support a civil rights claim." *Brown v. Grabowski*, 922 F.2d 1097, 1100–01 (3d Cir. 1990) (citing *DeShaney v. Winnebago County Department of Social Service*, 489 U.S. 189 (1989)); *Bright*, 443 F.3d at 282. As explained above, *see* pp. 8–9, it is only the affirmative *misuse* of authority, and not the *failure* to exercise authority, that can give rise to a constitutional violation. *Id.* The tort consists in a state actor's "*affirmative*[]use[ of] his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state *not acted at all.*" *Id.* "While we have acknowledged that the line between action and inaction may not always be clear, we have never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised." (*Id.*; internal citations omitted).

This is a tragic case that evokes deep sympathy and highlights the costs of immunity doctrines. Immunity is necessary, however, to preserve the vital independence of prosecutors and their essential role in the justice system. These personal-capacity claims challenge AP Gomperts's decisions in connection with the prosecution, or non-prosecution, of Lomando. Such decisions, whether right or wrong, are shielded by absolute prosecutorial immunity.

### III.    Conclusion

For the reasons provided throughout this Opinion, I will grant Defendants' Motion (DE 7) to dismiss the Amended Complaint.

An appropriate order follows.

Dated: January 27, 2021

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**